**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

RICH FREIBERG,

               Plaintiff,

     v.

HUB INTERNATIONAL LIMITED,

               Defendant.

Civil Action No.:

**PROPOSED CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Rich Freiberg (hereinafter, "Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to himself and on information and belief as to all other matters, by and through his counsel, hereby brings this Class Action Complaint against Defendant Hub International Limited (hereinafter "Hub").

## INTRODUCTION

1.     On or around May 18, 2023, Hub lost control over its customer's highly sensitive personal information in a data breach perpetrated by cybercriminals (the "Data Breach").

2.     The Data Breach exposed the personal information belonging to what is estimated to be 479,261 customers, including names, financial account numbers and credit/debit card numbers (in combination with security code, access code, password or

PIN for the accounts). That exposure disturbs customers, as they no longer control their highly sensitive and confidential Personal Information, cannot stop others from viewing it, cannot prevent criminals from misusing it, and crucially cannot control where and to whom that Personal Information is sold and subsequently used.

3.      Plaintiff is a Data Breach victim having received Hub's Data Breach notice.

4.      Since Hub's Data Breach, Plaintiff has been put at a heightened risk of identity theft and fraud.

5.      Plaintiff brings this Class Action on behalf of himself and all others harmed by Hub's misconduct.

## PARTIES

6.      Plaintiff is a natural person and citizen and resident of North Carolina.

7.      Defendant Hub is a is a corporation organized and existing under the laws of Delaware, having its principal place of business in Chicago, Illinois.

## JURISDICTION & VENUE

8.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this a class action with diversity between at least one class member (including Plaintiff) and one defendant, the aggregate amount of damages exceeds $5,000,000.00, and unnamed class members are citizens across the United States. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

9.      This Court has personal jurisdiction over Hub, which has its principal place of business in this District.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)–(c) because Defendant resides here and the events giving rise to Plaintiff's causes of action occurred in this District.

## FACTUAL ALLEGATIONS

**A. Appropriate Cybersecurity Measures are Crucial for Companies that Collect, Store, and Use Sensitive and Confidential Information.**

11. Industry leaders recognize that companies need to improve their defenses, particularly how sensitive and confidential information is stored. Rob Carey, former principal deputy chief information officer for the Department of Defense, acknowledged that in years past companies "would do what was necessary, but maybe not sufficient" to protect consumers' data.[1] With the recent updates from the White House's cybersecurity strategy, Mr. Carey suggests that companies with "close[] the gap between necessary and sufficient levels of cyber defense and what is expected" to secure and protect consumers' sensitive and confidential information.[2] Indeed, "the cost of preparation and sort of defense is far less than cleaning up a cyber spill . . . or cyber-attack."[3]

12. A survey of 683 chief information officers and IT executives revealed that the mean IT budget devoted to cybersecurity was 15%, with nearly one quarter of

---

[1] Lauren Williams, *Companies Prepare to Spend More on Cybersecurity Under New Rules*, Defense One (March 7, 2023) *available at* https://www.defenseone.com/defense-systems/2023/03/companies-prepare-spend-more-cybersecurity/383723.

[2] *Id.*

[3] *Id.*

organizations (23%) devoting 20% or more of their IT budget to security.[4]  That same survey resulted in 40% of the respondents admitting that the need to increase cybersecurity protections was paramount to improving customer experience, growing the business, transforming existing business processes, and improving profitability.[5]

13.     It is undisputed that cybersecurity is crucial where consumers' sensitive and confidential information is stored by companies and organizations. However, despite the threat environment increasing, in 2023 IT and cybersecurity departments were the second most impacted by layoffs and cost cutting.[6]

14.     A survey from 2022 revealed that only 17% of organizations polled had performed an audit of their cybersecurity vulnerabilities within the preceding 12 months; 17% of organizations had cybersecurity training for employees in the last 12 months; and just 34% had business continuity plans that covered cybersecurity.[7]

**B.     Hub Collects and Promises to Protect Customers' Confidential Information.**

15.     Hub is a leading North American insurance brokerage that provides employee benefits, business, and personal insurance products and services.

---

[4]Bob Violino, *How much should you spend on security?*, CSO Online (Aug. 20, 2019) *available at* https://www.csoonline.com/article/567633/how-much-should-you-spend-on-security.html.

[5]*Id.*

[6]*Global Survey Reveals Cybersecurity Budgets Should be Spent on Security Operations in 2023*, Arctic Wolf (Jan. 23, 2023) *available at* https://arcticwolf.com/resources/blog/cybersecurity-budgets-spent-security-operations-2023.

[7]Johnty Morgan, *How much should you be spending on your cybersecurity?*, Gallagher (April 6, 2022) *available at* https://www.ajg.com/uk/news-and-insights/2022/april/spending-on-your-cybersecurity.

16.     To operate its business, Hub must create, collect, and store customers' and policy holders' Personal Information.

17.     As a result, Hub requires its customers and policy holders to disclose their Personal Information to receive Hub's services, including their names, social security numbers, addresses, phone numbers, and dates of birth.

18.     In doing so, Hub promises those customers that it will protect their information under state and federal law and its internal policies.

19.     On Hub's website, Hub represents that, "We generally only disclose your Personal Information to perform services on your behalf and provide you with the insurance products and services you expect from us."[8]

20.     On Hub's website, Hub represents that, "We maintain technical and organizational security measures reasonably designed to protect the security of your Personal Information against loss, misuse, unauthorized access, disclosure, or alteration. Hub International Limited and its affiliates take steps in accordance with the Systems Information and Standards of our Code of Business Conduct and Ethics to secure your Personal Information with appropriate levels of security around storage and use."[9]

21.     On Hub's website, Hub represents that, "In the event of a breach impacting your Personal Information, we intend to provide you with notification to the extent required by applicable law."[10]

---

[8] https://www.hubinternational.com/about-us/privacy-policy/.

[9] *Id.*

[10] *Id.*

22.     Upon information and belief, Hub represented to its employees, customers, policyholders, and members orally and in written contracts, marketing materials, and otherwise that it would properly protect all PII it obtained. Upon information and belief, Hub knew or reasonably should have known that such representations would be passed on to the public including Plaintiff and Class Members.

23.     However – as evidenced by its loss of control of its customers' data – Hub never implemented the security safeguards sufficient to fulfill those duties, failing to adequately train its employees on data security, develop policies to prevent breaches, enforce those policies, follow industry standard guidelines on cybersecurity, and timely respond to data breaches and inform customers as required by law. As a result, Hub left customers' Personal Information a vulnerable target for theft and misuse.

24.     Hub's negligence in safeguarding Plaintiff's and Class Members' PII was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

25.     Despite the prevalence of public announcements of data breaches and data security compromises, Hub failed to take appropriate steps to protect Plaintiff's and Class Members' PII from being compromised.

26.     Hub failed to properly select its information security partners.

27.     Hub failed to ensure the proper monitoring and logging of the ingress and egress of network traffic.

28.     Hub failed to ensure the proper monitoring and logging of file access and modifications.

29.     Hub failed to ensure the proper training of its technology partners' employees as to cybersecurity best practices.

30.     Hub failed to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

31.     Hub failed to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed.

32.     Hub knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII.

33.     Hub failed to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and potentially disclose it to others without consent.

34.     Upon information and belief, Hub failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

35.     Upon information and belief, Hub failed to ensure the proper encryption of Plaintiff's and Class Members' PII and monitor user behavior and activity to identify possible threats.

**C.     The Data Breach**

36.     On or about August 11, 2023, Hub notified the public ("Notice of Data Breach" or "Notice") that its customers' data had been compromised in a Data Breach, and informed them of the following:

**Nature of the Data Event**

On January 17, 2023, HUB identified suspicious activity on certain systems within its network. In response, HUB promptly isolated the impacted systems and commenced a forensic investigation. The investigation determined that certain systems within the network were accessed by an unknown individual and files were copied without authorization between December 2022 and January 2023. HUB is in the midst of a comprehensive review of the files to determine their content and to whom they relate and is providing relevant notices as information becomes available. On July 27, 2023, HUB completed its initial review and determined that the information that could have been subject to unauthorized access related to [] residents includes name, Social Security number, driver's license number, and financial account information.[11]

37.     Upon information and belief, Hub has sufficient control over the data compromised in the Breach to properly secure that data.

38.     Upon information and belief, Plaintiff's and Class Members' affected PII was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

39.     It is likely the Data Breach was targeted at Hub due to its status as a large insurance company.

40.     In violation of various laws, including N.C. Gen. Stat. § 75-65 and 815 Ill. Comp. Stat. 530/10, Hub was unreasonably delayed in providing notice of the Breach to Plaintiff and Class Members.

41.     Time is of the essence when highly sensitive PII is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is likely available on the Dark Web. Hackers can access and then offer for

---

[11]     https://apps.web.maine.gov/online/aeviewer/ME/40/a5e4c9cb-5a57-4d11-aa3a-88c06e7a220d/cbae5041-4b0b-4eea-847a-a514f26ce92d/document.html.

sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

42.     Following the Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Hub encouraged impacted individuals to "remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors" and to take the following steps:

    a.  order your free credit report;

    b.  if you believe you are the victim of identity theft or have reason to believe your personal information has been misused, contact the FTC and/or your state's attorney general office about for information on how to prevent or avoid identity theft;

    c.  place a security freeze; and

    d.  place a fraud alert.[12]

43.     Hub largely put the burden on Plaintiff and Class Members to take measures to protect themselves.

---

[12] *Id.*

44.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[13]

45.     According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[14] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[15] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

46.     Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

---

[13] *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text= In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour (last accessed Oct. 21, 2022); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data,* https://data.bls.gov/cew/apps/table_maker/v4/ table_maker.htm%23type=1&year=2021&qtr=3&own=5&ind=10&supp=0 (last accessed Aug. 2, 2022) (finding that on average, private-sector workers make $1,253 per 40-hour work week.).

[14] Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019).

[15] *Id.*

47.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII with the intent of engaging in misuse of the PII, including marketing and selling Plaintiff's and Class Members' PII.

48.    Hub also offered credit monitoring services for a period of 12 months. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

**D.    Plaintiff's Experience**

49.    Plaintiff is a current Hub customer.

50.    Plaintiff is also a victim of the Data Breach, having received Hub's Notice on or around August 11, 2023.

51.    Plaintiff provided his Personal Information to Hub and trusted that Hub would use reasonable measures to protect it. Accordingly, Plaintiff expected that his Personal Information would be protected according to state and federal law and any applicable internal policies at Hub.

52.    As a result of the Data Breach and at the recommendation of Hub and its Notice, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including reviewing financial records.

53.    Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss

of his privacy, as well as anxiety over the impact of cybercriminals accessing and using his PII and PHI and/or financial information.

54.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from their PII and PHI and financial information, in combination with their names, being placed in the hands of unauthorized third parties/criminals.

55.     Plaintiff has a continuing interest in ensuring that his PII and PHI and financial information, which, upon information and belief, remains backed up in Hub's possession, is protected and safeguarded from future breaches.

**E.    Plaintiff and the Class Face Significant Risk of Continued Identity Theft.**

56.     Plaintiff and Class Members have suffered injury from the misuse of their Personal Information that can be directly traced to Hub.

57.     As a result of Hub's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

  a.  The loss of the opportunity to control how Plaintiff's Personal Information is used;

  b.  The compromise and continuing publication of Plaintiff's Personal Information;

  c.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

  d.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    e.   Delay in receipt of tax refund monies;

    f.   Unauthorized use of stolen Personal Information; and

    g.   The continued increased risk to Plaintiff or his Personal Information, which remains in the possession of Hub and is subject to further breaches so long as Hub fails to undertake the appropriate measures to protect the Personal Information in its possession.

58.    Stolen Personal Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Personal Information can be worth up to $1,000.00 depending on the type of information obtained. Thus, criminals willingly pay money for access to Personal Information, which enables those criminals to commit fraud and identity theft to the detriment of patients and consumers, including Plaintiff and members of the Class.

59.    The value of Plaintiff's and Class Members' Personal Information on the black market is considerable. Stolen Personal Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

60.    It can take victims years to spot identity or Personal Information theft, giving criminals plenty of time to use that information for cash.

61.    One such example of criminals using Personal Information for profit is the development of "Fullz" packages.

62.    Cyber-criminals can cross-reference two sources of Personal Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly

complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

63.     The development of "Fullz" packages means that stolen Personal Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' Personal Information, and other sources and identifiers. In other words, even if certain types of information may not be included in the Personal Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and Class Members' stolen Personal Information are being misused, and that such misuse is fairly traceable to the Data Breach.

64.     Hub disclosed the Personal Information of Plaintiff and Class Members to unauthorized third parties to use in the conduct of criminal activity. Specifically, Hub exposed the Personal Information of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics.

65.     Hub's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Personal Information and take other necessary steps to mitigate the harm caused by the Data Breach.

66.     Had Hub timely and properly notified Plaintiff and Class Members of the Data Breach, Plaintiff and Class Members could have taken proactive, rather than reactive,

14

mitigating measures. Plaintiff, had he received timely notice, could have placed a freeze on his credit and taken other precautions, which would mitigate exposure to criminal activity.

**F.      Hub failed to adhere to FTC Guidelines.**

67.      According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Hub, should employ to protect against the unlawful exposure of Personal Information.

68.      In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.  The guidelines explain that businesses should:

      a.  protect the personal customer information that they keep;

      b.  properly dispose of personal information that is no longer needed;

      c.  encrypt information stored on computer networks;

      d.  understand their network's vulnerabilities; and

      e.  implement policies to correct security problems.

69.      The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

70.      The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

71.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72.     Hub's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' (*i.e.*, consumers') Personal Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS ALLEGATIONS

73.     This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure. All requisite elements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed Class and any subclasses are ascertainable; and a single class action is the superior manner to proceed when compared to the joinder of thousands, or tens of thousands, of individual cases challenging the same practices.

74.     Plaintiff brings this action individually on behalf of himself, and on behalf of the Class and Subclass(s) defined below, for which Plaintiff is a member, under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages, restitution,

injunctive and declaratory relief pursuant to the applicable laws set forth in the state law counts below.

75.     This action is brought on behalf of a national class (the "Class"), consisting of:

> All persons whose Personal Information was impacted by the Data Breach, including all who were sent a notice of the Data Breach.

76.     The Class Period for the Class dates back to the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through the present and to the date of judgment.

77.     Excluded from the Class are Defendant, its corporate parent, subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and the legal representatives, assigns of any such excluded persons or entities, and the attorneys for Plaintiff herein. Also excluded from the Class are any judges presiding over these proceedings and their immediate family members.

78.     **Numerosity**: The members of the Class are so numerous that joinder of all members is impracticable. While the exact numbers of Class members are unknown to Plaintiff at this time, Plaintiff on information and belief believes that the numbers exceed 479,261.

79.     **Common Questions of Law and Fact Predominate**: The questions of law and fact common to the Class predominate over questions affecting only individuals. Among the questions of law and fact common to the Class are:

a. Whether Hub violated state and federal laws by failing to properly store, secure, and dispose of Plaintiff's and Class Members' Personal Information;

b. Whether Hub failed to employ reasonable and adequate data and cybersecurity measures in compliance with applicable state and federal regulations;

c. Whether Hub acted willfully, recklessly, or negligently regarding securing Plaintiff's and Class Members' Personal Information;

d. How the Data Breach occurred;

e. Whether Hub failed to timely notify Plaintiff and Class Members of the Data Breach;

f. Whether Plaintiff and Class Members are entitled to restitution, damages, compensation, or other monetary relief; and

g. Whether Plaintiff and Class Members are entitled to injunctive and declaratory relief necessary to secure their Personal Information from further intrusion, exposure, and misuse.

80. Common sources of evidence may also be used to demonstrate Hub's unlawful conduct on a class-wide basis, including, but not limited to, documents and testimony about its data and cybersecurity measures (or lack thereof); testing and other methods that can prove Hub's data and cybersecurity systems have been or remain inadequate; documents and testimony about the source, cause, and extent of the Data Breach; and documents and testimony about any remedial efforts undertaken as a result of the Data Breach.

81. **Typicality**: Plaintiff's claims are typical of other Class members' claims because Plaintiff, like every other Class member, was exposed to virtually identical conduct and was overcharged.

82. **Adequacy**: Plaintiff can fairly and adequately represent the Class's interests; Plaintiff has no conflicts of interest with other Class members and has retained counsel competent and experienced in data breach litigation, class actions and complex civil litigation.

83. **Ascertainability**: The identities of individual Class members are readily ascertainable through appropriate discovery from business records maintained by Hub and their agents.

84. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable, the likelihood of individual Class members prosecuting separate claims is remote and individual members do not have a significant interest in individually controlling the prosecution of separate actions. No difficulty will be encountered in this case's management to preclude maintenance as a class action.

85. **Manageability**: The Class litigation will be manageable because all issues are identical, and individualized calculation of damages can be accomplished methodically by an expert via the use of data and information provided by Hub and its agents.

86. Plaintiff and Class Members have suffered injury, harm, and damages because of Hub's unlawful and wrongful conduct. Absent a class action, Hub will continue to maintain Plaintiff's and Class Members' Personal Information that could be subject to future breaches due to lax or non-existent cybersecurity measures, and such unlawful and improper conduct should not go unchecked nor remedied. Absent a class action, the Class Members will not be able to effectively litigate these claims and will suffer further harm

19

and losses, as Hub will be allowed to continue such conduct with impunity and benefit from its unlawful conduct.

87.     Adequate notice can be given to Class Members directly using information maintained in Hub's records.

88.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above, including in paragraph 88.

89.     Hub has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence
### On behalf of Plaintiff and the Class

90.     Plaintiff realleges paragraphs 1-89 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

91.     Hub had a duty to exercise reasonable care and protect and secure Plaintiff's and Class Members' Personal Information. This duty exists at common law and is also codified under Federal law (*see*, *e.g.*, FTCA and FCRA).

92.     Through its acts and omissions, Hub breached its duty to use reasonable care to protect and secure Plaintiff's and Class Members' Personal Information by employing substandard or non-existent data and cybersecurity protocols.

93.    Hub further breached its duties by failing to employ industry standard data and cybersecurity measures to gain compliance with those laws, including, but not limited to, proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

94.    It was reasonably foreseeable, particularly given legal mandates governing health data protection and the growing number of data breaches of health information— including past data breaches at Hub—that the failure to reasonably protect and secure Plaintiff's and Class Members' Personal Information would result in an unauthorized third-party again gaining access to Hub's networks, databases, and computers that stored or contained Plaintiff's and Class Members' Personal Information.

95.    Plaintiff's and Class Members' Personal Information constitutes personal property that was stolen due to Hub's negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

96.    Hub's negligence directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' unencrypted Personal Information and Class Members have suffered and will continue to suffer damages because of Hub's conduct. Plaintiff and Class Members seek damages and other relief because of Hub's negligence.

## COUNT II
**Breach of Express Contract**
**On behalf of Plaintiff and the Class**

97.    Plaintiff realleges paragraphs 1-89 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

98.    Hub provides life insurance products to Plaintiff and Class Members pursuant to the terms of its contracts, which all were a party to, including agreements regarding the handling of their confidential Personal Information in accordance with Hub's policies, practices, and applicable law. Plaintiff not in possession of these contracts but upon information and belief these contracts are in the possession of Hub. As consideration, Plaintiff and Class Members paid money to Hub and/or their insurers for life insurance products. Accordingly, Plaintiff and Class Members paid Hub to securely maintain and store their Personal Information. Hub violated these contracts by failing to employ reasonable and adequate security measures to secure Plaintiff and Class Members' Personal Information and by disclosing it for purposes not required or permitted under the contracts.

99.    Plaintiff and Class Members have been damaged by Hub's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

## COUNT III
### Breach of Implied Contract In Fact
### On behalf of Plaintiff and the Class

100.    Plaintiff realleges paragraphs 1-89 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

101.    Hub provides life insurance products to Plaintiff and Class Members also formed an implied contract with Hub regarding the provision of those services through their collective conduct, including by Plaintiff and Class Members paying for life insurance products from Hub and by Hub's sale of life insurance products, regarding the handling of

their confidential Personal Information in accordance with Hub's policies, practices, and applicable law.

102.    As consideration, Plaintiff and Class Members paid money to Hub and/or their insurers for life insurance products. Accordingly, Plaintiff and Class Members paid Hub to securely maintain and store their Personal Information. Hub violated these contracts by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class Members' Personal Information and by disclosing it for purposes not required or permitted under the contracts or agreements.

103.    Plaintiff and Class Members have been damaged by Hub's conduct, including by paying for data and cybersecurity protection that they did not receive, as well as by incurring the harms and injuries arising from the Data Breach now and in the future.

### COUNT IV
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

104.    Plaintiff realleges paragraphs 1-89 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

105.    Plaintiff and Class Members conferred a benefit on Hub by paying for data and cybersecurity procedures to protect their Personal Information that they did not receive.

106.    This conferral of benefit was not incidental to Plaintiff's and Class Members' treatment and Class Members expected that Hub would ensure that their Personal Information would remain secure and not be disclosed to unauthorized third parties by, *inter alia*, devoting appropriate and sufficient budgets to secure and protect that Personal Information.

107.    Hub has retained the benefits of its unlawful conduct including the amounts received for data and cybersecurity practices that it did not provide. Due to Hub's conduct alleged herein, it would be unjust and inequitable under the circumstances for Hub to be permitted to retain the benefit of its wrongful conduct.

108.    Plaintiff and the Class Members are entitled to full refunds, restitution and/or damages from Hub and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Hub from its wrongful conduct. If necessary, the establishment of a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation may be created.

109.    Additionally, Plaintiff and the Class Members may not have an adequate remedy at law against Hub, and accordingly plead this claim for unjust enrichment in addition to or, in the alternative to, other claims pleaded herein.

### COUNT V
**Breach of Confidence**
**On behalf of Plaintiff and the Class**

110.    Plaintiff realleges paragraphs 1-89 above as if fully set forth herein. Plaintiff brings this claim on behalf of the Class set forth above.

111.    At all times during Plaintiff's and Class Members' relationship with Hub, Hub was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' Personal Information.

112.    As alleged herein and above, Hub's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members'

Personal Information would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

113. Plaintiff and Class Members provided their Personal Information to Hub with the explicit and implicit understandings that Hub would protect and not permit Personal Information to be disseminated to any unauthorized parties.

114. Plaintiff and Class Members also provided their Personal Information to Hub with the explicit and implicit understandings that Hub would take precautions to protect such Personal Information from unauthorized disclosure.

115. Hub voluntarily received in confidence Plaintiff's and Class Members' Personal Information with the understanding that the Personal Information would not be disclosed or disseminated to the public or any unauthorized third parties.

116. Due to Hub's failure to prevent, detect, or avoid the Data Breach from occurring by, *inter alia*, following industry standard information security practices to secure Plaintiff's and Class Members' Personal Information, Plaintiff and Class Members' Personal Information was disclosed and misappropriated to unauthorized third parties beyond Plaintiff's and Class Members' confidence, and without their express permission.

117. As a direct and proximate cause of Hub's actions and/or omissions, Plaintiff and Class Members have suffered damages.

118. But for Hub's disclosure of Plaintiff's and Class Members' Personal Information in violation of the parties' understanding of confidence, their protected Personal Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Hub's Data Breach was the direct and legal cause of the

theft of Plaintiff's and Class Members' protected Personal Information, as well as the resulting damages.

119.     The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Hub's unauthorized disclosure of Plaintiff's and Class Members' Personal Information.

120.     As a direct and proximate result of Hub's breaches of confidence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Personal Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Personal Information; (iv) lost opportunity costs associated with effort expended to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from medical fraud, financial fraud, and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their Personal Information, which remain in Hub's possession and is subject to further unauthorized disclosures so long as Hub fails to undertake appropriate and adequate measures to protect the Personal Information of patients in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Personal Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

121.     As a direct and proximate result of Hub's breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, prays for relief as follows:

A.     For an Order certifying this case as a class action and appointing Plaintiff as Class Representative and the undersigned as Class Counsel;

B.     Awarding monetary and actual damages and/or restitution, as appropriate, or nominal damages in the alternative;

C.     Awarding declaratory and injunctive relief as permitted by law or equity to assure that the Class has an effective remedy, including enjoining Hub from continuing the unlawful practices as set forth above;

D.     Awarding pre- and post-judgment interest to the extent allowed by the law;

E.     Awarding all costs, experts' fees and attorneys' fees, expenses, and costs of prosecuting this action; and

F.     Such other and further relief as the Court may deem just and proper.

DATED: September 12, 2023         Respectfully Submitted,

                                  */s/ John A. Yanchunis*

                                  John A. Yanchunis
                                  Bar No. 0324681
                                  jyanchunis@forthepeople.com
                                  Ra O. Amen*
                                  ramen@forthepeople.com
                                  **MORGAN & MORGAN**
                                  **COMPLEX LITIGATION GROUP**
                                  201 North Franklin Street 7th Floor
                                  Tampa, Florida 33602
                                  T: (813) 223-5505

F: (813) 223-5402

*Pro hac vice forthcoming*

**Counsel for Plaintiff and the Class**